UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
SHAWN C. CARTER,                                    Index No. 10 CIV 0854 (DC)

                            Plaintiff,              **DECLARATION OF
                                                    DAVID E. ROSS**

          -against-

HIGHLAND CAPITAL MANAGEMENT, L.P.
and NEXBANK SSB,

                            Defendants.
------------------------------------------------------------------X

          David E. Ross, an attorney duly admitted to practice law before this Court and the Courts

of the State of New York, hereby declares, under the penalties of perjury, as follows:

          1.        I am Counsel in the law firm of Meister, Seelig & Fein LLP, attorneys for

Defendants Highland Capital Management, L.P. ("Highland") and NexBank SSB ("NexBank",

Highland and NexBank are hereinafter referred to collectively as "Defendants").

          2.        I respectfully submit this declaration in support of Defendants' motion for an

Order as follows: (1) pursuant to Fed. R. Civ. P. 12(f) striking paragraphs 22-25 and 57-62 of

Plaintiff Shawn C. Carter's Complaint dated February 2, 2010 (the "Complaint") and Exhibits A-

C attached thereto in their entirety; (2) striking portions of paragraphs 27, 28, 29 and 32 from the

Complaint in accordance with Fed. R. Civ. P. 12(f); and (3) pursuant to Fed R. Civ. P. 12(b)(6)

dismissing the Complaint's Fifth Cause of Action.

          3.        Attached as Exhibit "A" is a true and correct copy of the Complaint.

          4.        Attached as Exhibit "B" is a true and correct copy of the Pre-Negotiation

Agreement dated August 3, 2010 by and between, *inter alia*, Plaintiff and Defendants.

          5.        Attached as Exhibit "C" are true and correct copies of Exhibits A-C that Plaintiff

attached to the Complaint.

Dated: New York, New York
      April 30, 2010

                                                     DAVID E. ROSS

1249-508 Doc# 55

**EXHIBIT A**

JUDGE CHIN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X

10 CIV 0854

SHAWN C. CARTER,

                                    Plaintiff,

        -against-

HIGHLAND CAPITAL MANAGEMENT, L.P. and
NEXBANK SSB,

                                    Defendants.
--------------------------------------------------------------------X

10 Civ. _____

COMPLAINT

        Plaintiff, by his attorneys, Ferber Chan Essner & Coller, LLP, as and for his

complaint against defendants, alleges as follows:

                        JURISDICTION AND VENUE

        1.      This Court has jurisdiction of this action pursuant to 28 U.S.C.

§1332(a)(1), as the matter in controversy exceeds the sum or value of $75,000, exclusive

of interest and costs, and is between a citizens of different states.

        2.      Venue is proper in this district pursuant to 28 U.S.C. §1391(a) (2) in that a

substantial part of the events giving rise to plaintiff's claims occurred in this distinct.

                        THE PARTIES

        3.      At all relevant times, plaintiff was a resident of the County, City and State

of New York.

        4.      At all relevant times, upon information and belief, defendant Highland

Capital Management, L.P. ("Highland") was and is a limited partnership organized and

existing under the laws of the State of Delaware with its principal place of business in

Dallas, Texas and was doing and transacting business in the State of New York.

5.     At all relevant times, upon information and belief, defendant NexBank SSB ("NexBank") was a state savings bank organized and existing under the laws of the State of Texas with its principal place of business in Dallas, Texas and was doing and transacting business in the State of New York.  At all relevant times, upon information and belief, James Dondero, co-founder of and president of Highland, was and is chairman of NexBank's board of directors, and all of the shareholders of NexBank are partners in Highland.

STATEMENT OF FACTS

Relevant Background And
The Pertinent Transactions

6.     This action arises out of the efforts by defendants to bleed additional funds from plaintiff, a guarantor of a loan owned by Highland.  Because plaintiff and the other guarantors of that loan do not have personal liability for payment of the principal amount of that loan but did have personal liability for payment of interest and other carrying costs on that loan, defendants embarked on a bad faith course of conduct aimed at extracting additional payments of interest and other carrying costs.

7.     On August 6, 2007, J Hotels Fee Owner LLC ("Fee Owner"), a Delaware limited liability company, purchased the real property located at 511 West 21st Street, New York, New York (the "Property").  Fee Owner intended to use the Property for the development of a hotel.

8.     Also on August 6, 2007, Fee Owner entered into a loan agreement with Column Financial, Inc. ("Column") pursuant to which it borrowed $52 million (the "Senior Loan").  The Senior Loan was secured by a first mortgage on the Property.

9.     Pursuant to Section 7.4.1 of the Loan Agreement dated August 6, 2007 between Column and Fee Owner, relating to the Senior Loan (the "Senior Loan Agreement"), Fee Owner deposited certain funds into a reserve account (the "Environmental Reserve") in an amount more than sufficient to satisfy any costs of environmental remediation of the Property.

10.    Also on August 6, 2007, plaintiff, Charles Blaichman ("Blaichman") and Abram Shnay ("Shnay") entered into a guaranty agreement (the "Bad Acts Guaranty") and a guaranty of carry obligations (the "Carry Guaranty") with regard to the Senior Loan.

11.    Pursuant to the Carry Guaranty, plaintiff, Blaichman, and Shnay jointly and severally guaranteed the payment of certain defined "Guaranteed Obligations" of Fee Owner, which consisted of the ongoing carrying costs of the Property, including, but not limited to, real estate taxes, insurance, and interest on the Senior Loan, but expressly *excluding* the principal of the Senior Loan.

12.    The Carry Guaranty provides, in Section 1.2, that the guarantors' obligations under it would terminate on a "Tender Date", which it defines as the date when: (a) Fee Owner delivers, to the lender, a deed to the Property in lieu of foreclosure, (b) the guarantors pay all sums owing under the Carry Guaranty, (c) all transfer taxes relating to the transfer of the Property in lieu of foreclosure are paid, (d) all necessary documents relating to the transfer of the Property are delivered to the lender, (e) the Environmental Reserve is replenished or supplemented in an amount equal to 125% of the amount reasonably determined by the lender's consultant to be sufficient to complete the environmental remediation of the Property, and (f) Fee Owner and the guarantors have ratified their environmental indemnification obligations.

13.     Pursuant to the Bad Acts Guaranty, the guarantors could be liable for certain sums not covered by the Carry Guaranty in the event of certain breaches of duty by Fee Owner, but no such breaches of duty have occurred.

14.     Also on August 6, 2007, J Hotels Mezzanine I LLC ("J Mezz"), a Delaware limited liability company and the sole member of Fee Owner, borrowed $11.8 million (the "Mezzanine Loan") from Square Mile Structured Debt (One) LLC and Square Mile Structured Debt (Three) LLC.  The Mezzanine Loan was secured by a pledge by J Mezz of its equity interest in Fee Owner.

15.     Also on August 6, 2007, plaintiff, Blaichman and Shnay entered into a guaranty of carry obligations (the "Mezz Carry Guaranty") with regard to the Mezzanine Loan.

16.     Pursuant to the Mezz Carry Guaranty, plaintiff, Blaichman and Shnay jointly and severally guaranteed the payment of certain defined "Guaranteed Obligations" of Fee Owner and J Mezz, which consisted of the ongoing carrying costs of the Property, including, but not limited to, real estate taxes, insurance and interest on the Mezz Loan, but expressly *excluding* the principal of the Mezz Loan.

17.     The Mezz Carry Guaranty provides, *inter alia*, that the guarantors' obligations will terminate on the "Tender Date" as defined in the Carry Guaranty.

18.     Column subsequently assigned all of its interest in the Senior Loan and all associated documents to NexBank.  At all relevant times, NexBank acted as servicer of the Senior Loan on behalf of Highland, which in turn acted on behalf of various investment vehicles sponsored or controlled by Highland.  At all relevant times since this assignment, Highland, directly or through such investment vehicles, has been the

beneficial owner of the Senior Loan. By virtue of their relationship and conduct, as

alleged herein, Highland and NexBank are jointly and severally liable for the alleged

wrongdoing.

19.     The Senior Loan matured on August 6, 2009.

The Abortive Negotiations
With Highland

20.     Prior to the maturity of the Senior Loan, Fee Owner sought to discuss with

Highland the (a) upcoming maturity, (b) status of the Property, particularly in light of the

real estate crash and the devaluation of property values in New York and (c) general lack

of availability of project financing.

21.     As a pre-condition to permitting Fee Owner to have any conversations

with its lender, Highland required Fee Owner and the guarantors to enter into a pre-

negotiation agreement.  NexBank, Highland, Fee Owner and the guarantors entered into

such an agreement on or about August 3, 2009.

22.     Between August and November 2009, NexBank, Highland, Fee Owner

and the guarantors engaged in negotiations concerning a potential restructuring of the

Senior Loan, but those negotiations accomplished little because Highland and NexBank,

acting in bad faith, insisted upon requirements that they knew Fee Owner could not

reasonably undertake.

23.     On November 20, 2009, the parties met at the office of Highland's

counsel, and Fee Owner and the guarantors made a final attempt to discuss a restructuring

of the Senior Loan.  When it became apparent that the parties could not agree upon a

restructuring or settlement of the Senior Loan, the parties discussion turned to the

exercise of Fee Owner's right to deliver, to Highland, a deed in lieu of foreclosure of the Property.

24.     At that November 20 meeting, plaintiff explicitly advised Highland's counsel that the expeditious completion of this process was crucial to plaintiff since the Senior Loan was arguably accruing interest of approximately $20,000 per day, plus other carrying costs, and the Mezzanine Loan was arguably accruing interest of approximately $8,000 per day, plus other carrying costs. In response, Highland's representative, Ted Dameris, agreed that Highland would cooperate with the exercise of the guarantor's rights with respect to the tender and Highland's counsel agreed to deliver Highland's preferred form of deed to plaintiff's counsel on or before November 30, 2009. In a telephone call between plaintiff's and Highland's counsel on November 25, Highland's counsel reaffirmed this promise.

25.     Acting in bad faith, so that interest and carrying costs would continue to run, Highland's counsel failed to keep its promise. On November 30, December 2, December 7, December 8, and December 10, 2009, plaintiff's counsel sent e-mails to Highland's counsel inquiring about the status of the promised draft of the deed (copies of those e-mails attached as Exhibit A). Ignoring its obligation to act in good faith and deal fairly, Highland responded that plaintiff should continue to wait. On December 11, 2009, plaintiff's counsel sent an e-mail to Highland's counsel (copy attached as Exhibit B) demanding that Highland supply the draft deed, and advising that, if Highland failed to do so, plaintiff's counsel would prepare it on his own. Highland's counsel responded, in an e-mail on dated December 14, 2009 (copy attached as Exhibit C), that, notwithstanding

Highland's earlier promise and its two weeks of evasion, Highland "was not in a position

to deliver any drafts of proposed deed in lieu conveyance documents at this time."

The Tender To Highland

      26.    On December 22, 2009, plaintiff's counsel, pursuant to Section 1.2 of the

Carry Guaranty, delivered to Highland's counsel the following (the "Tender Deliveries") :

> -- a deed to the Property in lieu of foreclosure;
>
> -- a ratification by Fee Owner and the guarantors of their environmental indemnification obligations;
>
> -- certified trustee checks payable to NexBank totalling $2,712,253.28, representing disputed Carry Guaranty payments through December 22, 2009;
>
> -- a New York City Real Property Transfer Tax Return;
>
> -- a New York State Real Estate Transfer Tax Return; and
>
> -- a certified trustee check in the amount of $1,573,332 payable to the New York City Department of Finance, representing all transfer and recording fees.

      27.    The letter from plaintiff's counsel accompanying the Tender Deliveries

stated that these deliveries were being made in escrow and that Highland's counsel could

either (a) release the Tender Deliveries to Highland on or before 5 p.m. on December 23,

after confirming to plaintiff that they were sufficient to cause the occurrence of the

Tender Date (as defined in Section 1.2 of the Carry Guaranty), or (b) if Highland's

counsel did not release the Tender Deliveries by 5 p.m. on December 23, immediately

return the Tender Deliveries to plaintiff's counsel (copy of that letter attached as Exhibit

D).  Although Highland had already acted in bad faith and broken its express promises,

plaintiff's counsel hoped that Highland's counsel would honor escrow conditions, given the ethical ramifications of failing to do so.

28.     The deadline of December 23, 2009 was reasonable and necessary because (a) Highland had duplicitously stalled the tender since November 20 by initially promising to provide its preferred form of deed, then, after two weeks of misrepresentation and evasion, reneging on its promise, (b) as plaintiff's counsel had explained to Highland's counsel, it was important for tax reasons for the tender of the deed to occur on or before December 31, 2009, (c) although, under the Carry Guaranty, Highland was not entitled to a period to scrutinize the Tender Deliveries, plaintiff, in the interest of avoiding further disputes, wanted an opportunity to respond to any legitimate complaints raised by Highland with respect to the form and content of the Tender Deliveries before the end of the year, and (d) Highland only needed to review a two-page deed and some standard forms and confirm the amount of the checks -- a process that should have only taken no more than an hour or two.

29.     Because Highland breached its obligation to determine the amount necessary to complete the environmental remediation of the Property, plaintiff was unable to replenish or supplement the Environmental Reserve.  Plaintiff's counsel, in e-mails to Highland's counsel dated August 6, September 22, November 9 and December 8, 2009 (copies attached as Exhibit E), and in conversations with Highland's counsel, had demanded that Highland comply with the "Tender Date" definition by providing plaintiff with the reasonably determined amount necessary to complete the environmental remediation of the Property.  Although Highland never disputed its obligation to supply this amount and although it indicated on several occasions that this amount was

forthcoming, Highland, continuing its pattern of acting in bad faith and ignoring its contractual obligations, never supplied that amount to plaintiff or Fee Owner.

30.     Violating its obligations as escrow holder, Highland's counsel neither released the Tender Deliveries to Highland by 5 p.m. on December 23 nor immediately returned them to plaintiff's counsel. As a result, plaintiff's counsel repeatedly informed Highland's counsel that they were in breach of the escrow conditions contained in plaintiff's counsel's December 22, 2009 letter.

31.     Highland's counsel formally responded to the Tender Deliveries for the first time on the afternoon of December 31, 2009 (copy of Highland's counsel's letter attached as Exhibit F). Not only did the timing of that letter lay bare defendants' gratuitously malevolent attempt to deprive plaintiff of his deserved year-end tax benefits, but also its contents were redolent with bad faith. Highland's counsel claimed that Highland did not have adequate time to review and accept the Tender Deliveries but did not explain why Highland had waited nine days to assert this objection. Highland's counsel also disingenuously claimed that the Tender Deliveries did not conform to the Carry Guaranty because they lacked a payment to replenish or supplement the Environmental Reserve, but he did not explain how such a payment, even if owing, would have been possible in light of Highland's deliberate failure to respond to plaintiff's counsel's repeated requests that Highland honor its obligation to disclose the amount necessary to complete the environmental remediation of the Property.

32.     Having learned to expect rascality from Highland, plaintiff's counsel had remained in the office in spite of his firm's early closing for New Year's Eve and immediately responded to Highland's counsel's letter. In his responsive letter sent that

evening (copy attached as Exhibit G), plaintiff's counsel explained that, under the terms of the Carry Guaranty, Highland did not have the option of deciding whether or not to accept the Tender Deliveries; the only pertinent issue was whether the Tender Deliveries satisfied the requirements of the Carry Guaranty, and the Tender Deliveries did so.  In addition, Highland, by breaching its obligation to supply the amount reasonably determined to be sufficient to complete the environmental remediation of the Property, had forfeited any right to insist that the Environmental Reserve be replenished or supplemented.

33.     In a letter later that day (copy attached as Exhibit H), Highland's counsel continued to mewl about not having had "ample time" to review the Tender Deliveries but still failed to explain why nine days had not been sufficient time to review a handful of forms.  Highland's counsel did not contend that the Tender Deliveries failed to satisfy the requirements of the Carry Guaranty, because there was no colorable way to make such a contention; instead, he mused "[Highland] at this juncture takes no position on the issue and reserves all of its rights and remedies on the subject...."  Highland's counsel sent the Tender Deliveries via a Federal Express to plaintiff's counsel, who received them on January 4, 2010.

34.     On January 5, 2010, plaintiff's counsel sent the Tender Deliveries back to Highland's counsel, who retained them.

## FIRST CAUSE OF ACTION

35.     Plaintiff repeats the allegations of paragraphs 1 through 34.

36.     Plaintiff contends:

    a)      he satisfied all conditions in the Carry Guaranty concerning the Tender Date and therefore plaintiff's obligations under the Carry Guaranty terminated as of December 22, 2009, the date of the Tender Deliveries;

    b)      the only reason the Environmental Reserve might have been insufficient to comply with the Tender Date definition would have been that Highland wrongfully converted those funds;

    c)      even assuming *arguendo* that withdrawing the existing Environmental Reserve was lawful, Highland waived and forfeited the requirement that plaintiff replenish or supplement the Environmental Reserve.  By ignoring its contractual obligations to provide an Environmental Reserve amount, ignoring plaintiff's many requests over a four month period and misrepresenting that it would provide plaintiff with an Environmental Reserve amount; Highland intentionally prevented plaintiff from satisfying that condition of the Tender Date and should be barred from enforcing it; and

    d)      even assuming *arguendo* that Highland's contractual defaults, and tortious and bad faith conduct did not result in a waiver of the Environmental Reserve requirement, Highland's counsel's violation of the terms of escrow under which plaintiff made the Tender Deliveries resulted in the confirmation of the Tender Date and the satisfaction of the Environmental Reserve requirement.

37.     On information and belief, Highland disputes each of these contentions.

38.     Accordingly, there is an actual, justiciable controversy existing between the plaintiff and defendants as to whether all of the conditions set forth in the Carry Guaranty with regard to the Tender Date have been satisfied.

39.     Plaintiff is entitled to a declaratory judgment that all of the conditions set forth in the Carry Guaranty with regard to the Tender Date were satisfied by the Tender Deliveries to Highland's counsel on December 22, 2009 and all obligations under the Carry Guaranty were terminated as of December 22, 2009.

## SECOND CAUSE OF ACTION

40.     Plaintiff repeats the allegations of paragraphs 1 through 39.

41.     Plaintiff contends:

    a)    Highland was not entitled to withdraw any of the Environmental Reserve funds;

    b)    Highland must return to the Environmental Reserve all funds it diverted from Fee Owner's reserve account; and

    c)    plaintiff is not required to replenish or supplement the Environmental Reserve.

42.     The NexBank bank account statement for October, 2009 revealed that on October 9, 2009 (more than two months after plaintiff's counsel's initial request that Highland confirm the adequacy of the Environmental Reserve funds), Highland withdrew the Environmental Reserve funds from the escrow account where they had been maintained. Despite plaintiff's repeated requests, Highland has neither provided a legitimate explanation for its diversion of these funds nor identified where they are being held. Highland's counsel told plaintiff's counsel in October, 2009 that the funds were "set-off" against the Senior Loan, but as of December 22, 2009 Highland had not applied those funds to the Senior Loan. Accordingly, the conclusion is inescapable that Highland improperly diverted the Environmental Reserve funds and continues to wrongfully hold them for its own account.

43.     Alternatively, any Environmental Reserve funds withdrawn by Highland should have been applied to reducing plaintiff's obligations under the Carry Guaranty.

44.     There is an actual, justiciable controversy existing between plaintiff and Highland as to whether Highland was entitled to withdraw any of the Environmental

Reserve funds and whether plaintiff is required to replenish or supplement the Environmental Reserve.

45.     Plaintiff is entitled to a declaratory judgment that (a) Highland was not entitled to withdraw any of the Environmental Reserve funds, (b) Highland must return to the Environmental Reserve all of the funds it has diverted from Fee Owner's reserve account, (c) plaintiff is not required to replenish or supplement the Environmental Reserve and (d) in the alternative, the Environmental Reserve funds withdrawn by Highland should be applied to reducing plaintiff's obligations under the Carry Guaranty.

## THIRD CAUSE OF ACTION

46.     Plaintiff repeats the allegations of paragraphs 1 through 45.

47.     Section 1.5 of the Carry Guaranty provides that in the event Fee Owner fails to pay to the lender any of the Guaranteed Obligations then "Guarantor shall, immediately upon demand by Lender...pay... the amount due on the Guaranteed Obligations to Lender...."

48.     However, Highland never demanded payment by the guarantors of the Guaranteed Obligations.  Although Highland copied the guarantors on certain letters it sent to Fee Owner, which asserted that various amounts were due and owing under the Senior Loan, those letters did not demand payment of the Guaranteed Obligations by the Guarantors (and did not set forth the amounts purportedly owed by Fee Owner under the Senior Loan).  Accordingly, at the time of the Tender Deliveries, the guarantors did not owe any amounts to Highland pursuant to the Carry Guaranty, because no amounts had been demanded.  As a result, plaintiff is entitled to the return of the Carry Guaranty payments which were included in the Tender Deliveries.

49.     There is an actual justiciable controversy existing between plaintiff and Highland as to whether any amounts were owed under the Carry Guaranty on the December 22, 2009 Tender Date.

50.     Plaintiff is entitled to a declaratory judgment that no amounts were owed by plaintiff under the Carry Guaranty on the December 22, 2009 Tender Date and an injunction requiring Highland and NexBank to either return the checks for the disputed Carry Guaranty payments which were included in the Tender Deliveries, if they were not deposited or, if those checks were deposited, to a return of $2,712,253.28, the amount set forth in those checks.

## FOURTH CAUSE OF ACTION

51.     Plaintiff repeats the allegations of paragraphs 1 through 50.

52.     Under the terms of the pertinent loan documents, plaintiff was entitled to terminate his obligations under the Carry Guaranty and the Mezz Carry Guaranty by satisfying the requirements of the Tender Date as set forth in Section 1.2 of the Carry Guaranty.

53.     The implied covenant of good faith and fair dealing in the Senior Loan Agreement and the Carry Guaranty required Highland and NexBank to act reasonably to permit plaintiff to satisfy the requirements of the Tender Date.

54.     Highland and NexBank (a) breached their contractual obligations and their covenant of good faith and fair dealing by failing to supply plaintiff with the amount reasonably determined to be sufficient to complete the environmental remediation of the Property and (b) breached the covenant of good faith and fair dealing by initially promising to provide a form of deed to the Property in lieu of foreclosure and then

engaging in two weeks of evasion, only to break this promise when their evasive tactics could not be maintained any longer.

55.     These breaches of duty, delayed plaintiff's satisfaction of the requirements of the Tender Date and caused plaintiff to incur liability for additional interest under the Carry Guaranty and the Mezz Carry Guaranty.

56.     By reason of the foregoing, plaintiff has been damaged in an amount to be determined at trial but believed to be in excess of $3.7 million, representing the additional liability for additional interest and other costs incurred by plaintiff under the Carry Guaranty and the Mezz Carry Guaranty.

### FIFTH CAUSE OF ACTION

57.     Plaintiff repeats the allegations of paragraphs 1 through 49.

58.     Under the terms of the pertinent loan documents, plaintiff was entitled to terminate his obligations under the Carry Guaranty and the Mezz Carry Guaranty by satisfying the requirements of the Tender Date as set forth in Section 1.2 of the Carry Guaranty.

59.     On November 20, 2009, at the meeting at the offices of Highland's counsel, Meister Selig & Fein, Ted Dameris, a representative of Highland, said, to plaintiff's representative and plaintiff's counsel, that Highland would be happy to receive and retain the Property and would cooperate in the process of the delivery of the deed in lieu of foreclosure.  Following that, Stuart I. Rich, an attorney for Highland, said, to plaintiff's representative and plaintiff's counsel, that he would prepare and send his requested form of deed to plaintiff's counsel on or before November 30, 2009.  Mr. Rich

later confirmed his agreement to deliver the form deed in a telephone call with plaintiff's counsel on November 25.

60.     These statements by Messrs. Dameris and Rich were materially and knowingly false at the time they were made.  Mr. Dameris and Mr. Rich knew that Highland had no intention of supplying plaintiff with a form of deed.  Instead, by these statements Messrs. Dameris and Rich sought to conceal their true intentions to delay the Tender Date as long as possible.

61.     Plaintiff reasonably relied on these representations of Mr. Dameris and Mr. Rich and refrained from beginning preparation of a deed to the Property, a required element of the Tender Date, until December 14, 2009, when Mr. Rich finally admitted that Highland would not be supplying a form of a deed.  Had plaintiff known of the true facts -- that Highland had no intention of supplying a form of a deed -- plaintiff would have prepared the deed weeks earlier, would have made the Tender Delivery weeks earlier and would have avoided liability for additional interest under the Carry Guaranty and the Mezz Carry Guaranty.

62.     By reason of the foregoing, plaintiff has been damaged in an amount to be determined at trial.

WHEREFORE, plaintiff demands judgment as follows:

1.     On the first cause of action, a declaratory judgment that all the conditions set forth in the Carry Guaranty with regard to the Tender Date were satisfied by the Tender Deliveries to Highland's counsel on December 22, 2009 and all obligations under the Carry Guaranty were terminated as of December 22, 2009.

2.      On the second cause of action, a declaratory judgment that (a) Highland was not entitled to withdraw any of the Environmental Reserve funds, (b) Highland must return to the Environmental Reserve all of the funds it diverted from it, (c) plaintiff is not required to replenish or supplement the Environmental Reserve and (d) in the alternative, the Environmental Reserve funds withdrawn by Highland should be applied to reducing plaintiff's obligations under the Carry Guaranty.

3.      On the third cause of action, a declaratory judgment that no amounts were owed by plaintiff under the Carry Guaranty on the December 22, 2009 Tender Date and a permanent injunction requiring Highland and NexBank to either return the checks for the Carry Guaranty payments, which were included in the Tender Deliveries, if these checks were not deposited or, if these checks were deposited, to a return of $2,712,253.28, the amount set forth in those checks.

4.      On the fourth cause of action, damages against Highland and NexBank, jointly and severally in an amount to be determined at trial but believed to be in excess of $3.7 million;

5.      On the fifth cause of action, damages against Highland and NexBank, jointly and severally in an amount to be determined at trial; and

6.      Such other and further relief as to this Court appears just and proper,

together with pre-judgment and post-judgment interest, costs and disbursements.

Dated:    New York, New York
          February 2, 2010

                              FERBER CHAN ESSNER & COLLER, LLP

                              By: _____
                                      Robert N. Chan (RC8212)
                              Attorneys for Plaintiff
                              530 Fifth Avenue
                              New York, New York 10036
                              (212) 944-2200

**EXHIBIT B**

# PRE-NEGOTIATION AGREEMENT

This PRE-NEGOTIATION AGREEMENT ("Agreement") is entered into as of this __3__ day of July, 2009 by and among NexBank SSB, in its capacity as servicer ("NEXBANK"), a Texas state savings bank, Highland Capital Management, L.P., a Delaware limited partnership ("Highland"), on behalf of various investment vehicles sponsored or controlled by Highland, as lender ("Lender") under the Loan Documents (as defined below), J Hotels Fee Owner LLC, a Delaware limited liability company ("Borrower"), Shawn Carter, an individual ("Carter"), Abram Shnay ("Shnay"), Charles Blaichman ("Blaichman" and together with Carter and Shnay, collectively, the "Guarantors"). NEXBANK, Lender, Borrower and Guarantors are referred to herein, each as a "Party" and, collectively, as the "Parties". Capitalized terms used herein without definition shall have the meanings ascribed to them in the Loan Documents (as defined below).

## RECITALS

WHEREAS, on August 6, 2007, Column Financial, Inc. ("Original Lender") made a first mortgage loan in principal amount of $52,000,000 to Borrower in connection with Borrower's acquisition of the real property and improvements located at 510 West 22nd Street and 511-519 West 21st Street, New York, New York (the "Loan"); and

WHEREAS, in connection with the Loan, Original Lender and Borrower are parties to (i) that certain Loan Agreement, dated as of August 6, 2007, the "Loan Agreement") and other documents executed in connection with the Loan (as the same may have been amended from time to time prior to the date hereof, collectively, the "Loan Documents"); and

WHEREAS, in connection with the Loan, the Guarantors entered into (i) a Guaranty Agreement and (ii) Guaranty of Carry Obligations each dated as of August 6, 2007 in favor of Original Lender (collectively the "Guarantees"); and

WHEREAS, prior to the date hereof, the Loan, together with the Loan Documents and the Guarantees, were assigned by Original Lender to Lender and NEXBANK in their respective capacities as lender and servicer; and

WHEREAS, the Maturity Date of the Loan has been extended in accordance with the terms of the Loan Documents to and including August 9, 2009, the second Extended Maturity Date; and

WHEREAS, at the request of Borrower and Guarantors, NEXBANK and Lender have engaged in, and may continue to engage in, discussions relating to the potential modification of the Loan Documents, including the extension of the Extended Maturity Date. The Parties enter into this Agreement to mutually acknowledge the nature of, and certain understandings with respect to, the discussions referred to above.

**NOW THEREFORE**, in consideration of the mutual promises and covenants herein contained and intending to be legally bound hereby, the Parties hereto covenant and agree as follows:

## AGREEMENT

1.   Negotiations.

The Parties acknowledge and agree that (a) no Party has any obligation whatsoever to discuss, negotiate or to agree to any restructuring of the Loans or to any modification, extension, amendment, restructuring or reinstatement of the Loans or any of the Loan Documents, or to forbear or refrain from exercising or enforcing its rights and remedies under the Loan Documents and (b) no Party has made any representations, warranties or other statements in connection with the execution and delivery of this Agreement that such Party will at any time consent to a modification or waiver of any terms or conditions of any of the Loan Documents, that such Party would agree to an extension of the Extended Maturity Date of the Loan, that such Party would agree to a consensual workout, that such Party would advance any additional monies to any person or entity or that such Party would forbear or refrain from taking any enforcement action.

The conduct by and communications among the Parties (from and after July 13, 2009) shall not constitute offers, acceptances, contracts, or courses of dealing and shall have no effect whatsoever unless and until reduced to a written agreement signed by authorized representatives of the parties to be bound (a "Definitive Agreement"). In the course of these negotiations, and until such time as a Definitive Agreement has been executed by the Parties, the Loan Documents shall be unmodified and in full force and effect. NEXBANK and Lender expressly reserve all rights and remedies they may have against Borrower, Guarantors and any and all additional borrowers, debtors, and/or obligors under the Loan Documents. By execution of this Agreement and engaging in these discussions, no duty is created by which Borrower, Guarantors or NEXBANK or Lender shall be considered obligated to enter into a Definitive Agreement. Borrower and Guarantors specifically acknowledge with respect to any statement on or after June 13, 2009, that they have no basis for, and are not, relying on any prior statements by NEXBANK or Lender (or any of their respective representatives) nor any anticipated action by NEXBANK or Lender.

The Parties hereby agree that no Party shall have any obligation to continue with the discussions, and any Party, at such Party's sole and absolute discretion, may terminate the discussions at any time and for any reason or no reason, with or without cause upon notice, written or oral, without any liability or obligation to the other Parties hereto.

2.   Obligations.

Notwithstanding the commencement or continuation of such discussions or negotiations, as aforesaid, NEXBANK and Lender has not and do not waive the existence

of any Events of Default or Defaults or any rights or remedies against Borrower or Guarantors under the Loan Documents. NEXBANK and Lender shall not be limited or restricted from enforcing any rights or remedies available to it, including, without limitation, commencing judicial or non-judicial foreclosure proceedings, seeking the appointment of a rents, issues and profits receiver or otherwise, and NEXBANK and Lender expressly reserves all such rights and remedies.

Because the Parties recognize that these discussions and negotiations may not produce a mutually acceptable resolution of the overall problem, Borrower and Guarantors acknowledge that Borrower remains responsible for operating its business in a manner it deems appropriate. Borrower and Guarantors acknowledge and agree that no fiduciary or special relationship with NEXBANK and Lender is created by this Agreement or the participation of NEXBANK and Lender in any discussions referred to herein (whether in the future or prior to the date hereof). Borrower and the Guarantors specifically acknowledge and agree that, by execution of this Agreement or undertaking or continuing the discussion contemplated herein, neither NEXBANK nor Lender or any other servicer or representative thereof has made any promise, commitment, or representation whatsoever, nor has NEXBANK or Lender (or any of their respective representatives) incurred any obligation to Borrower or Guarantors to modify the terms of the Loan Documents, including without limitation, to grant any forbearances, extend the Maturity Date, extend the payment terms of the Loans or extend any other financial accommodation to Borrower or Guarantors.

3.     Written Agreements and Amendments. No officer or employee of NEXBANK or Lender is authorized to commit NEXBANK or Lender orally to any agreement, or to any modification of the existing Loan Documents, and Borrower and Guarantors expressly acknowledge and agree that they may not rely on any oral communication, unsigned document (including any email confirmation) or anything else from NEXBANK or Lender or any of their officers or employees that they may construe to the contrary (from and after July 13, 2009). While the Parties may reach agreement on one or more preliminary issues which are part of the subject of the contemplated discussions, the Parties acknowledge and confirm that none of the Parties have agreed and that none of the Parties shall be bound by any agreement on individual issues until (a) agreement is reached on all issues, and (b) such agreement on all issues has been reduced to a written agreement and signed by each of the Parties.

4.     Loan Documents Still in Force. The Parties agree that notwithstanding any other provision of this Agreement to the contrary, the Loan Documents are in full force and effect and shall remain unmodified and in full force and effect in accordance with their respective terms, regardless of whether a Definitive Agreement is duly executed by all Parties hereto; and then shall be deemed modified only to the extent specifically set forth in such Definitive Agreement.

5.     No Waivers. No negotiations or other action undertaken pursuant to this Agreement shall constitute a waiver of any Party's rights under the Loan Documents.

6.   Inadmissible Evidence.  From and after the date hereof, all evidence of conduct and communications of any nature whatsoever (whether oral or written, or express or implied) of any of the Parties in connection with the discussions that are the subject of this Agreement, or in any meetings or correspondence relating to possible modification of the Loan Documents (in each case, whether in the future or prior to the date hereof) from and after July 13, 2009 shall be inadmissible for any purpose whatsoever in any judicial or similar proceeding.  The foregoing sentence is intended to be broader than the restrictions on admissibility that may be contained in the Evidence Code of the State of New York and in Rule 408 of the Federal Rules of Evidence. Likewise, the discussions and all documents prepared in connection therewith shall be confidential and shall not be disclosed to any third party except for reasonably necessary disclosures to agents, lenders, investors, representatives, lawyers, and accountants, and except as may be required by law. Furthermore, such conduct, communications, discussions and documents shall not be used in any litigation to indicate culpability, weakness of position, admission of liability or otherwise admit any obligations due and owing to or from any Party hereto.

7.   Effect of Agreement.  Except as expressly provided herein, nothing in this Agreement shall alter or affect any provision, condition or covenant contained in the Loan Documents or affect or impair any rights, powers, remedies or defenses available under any of the Loan Documents.  Each Party acknowledges and represents to the other that it has received legal advice from counsel of its choice regarding the meaning and legal significance of this Agreement and that it is satisfied with its legal counsel and the advice received from such counsel.  Each Party acknowledges that it executed and delivered this Agreement on its own independent judgment, on the advice of legal counsel, and is under no threat, coercion or duress from any Party.

8.   No Obligations.  Each Party hereby acknowledges and agrees that neither this Agreement nor any Party's (nor their respective representatives') participation in any discussions or negotiations contemplated herein: (a) creates any obligation to modify, renew, compromise, extend, reinstate or otherwise amend the Loan Documents; (b) creates any express or implied obligations on the part of a Party (or its representatives); (c) constitutes an express or implied waiver of any right or remedy under any of the Loan Documents, or otherwise arising as a matter of law or at equity, all of which such rights and remedies are expressly reserved by such Party; (d) constitutes an agreement by a Party to refrain from taking any action which they may be entitled to take pursuant to any of the Loan Documents or pursuant to applicable law; or (e) constitutes a waiver or cure of any Event of Default or Default, whether or not material, now existing or hereafter arising under any of the Loan Documents or under applicable law.

9.   Miscellaneous.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which taken together shall constitute one and the same instrument. This Agreement constitutes the entire agreement concerning the subject matter and supersedes any prior or contemporaneous representations or agreements not contained herein concerning the subject matter of this Agreement.  This Agreement shall inure to the benefit of and be binding upon each Party hereto, and their respective heirs, successors and assigns, and shall be governed by New

4

York law.  Paragraph headings used herein are for convenience only and shall not be used to interpret any term thereof.  Each person executing this Agreement on behalf of any Party represents that he or she has the full authority and legal power to do so.  This Agreement may be amended only by an agreement in writing signed by all of the Parties (or their respective successors-in-interest).

10.     Fees and Expenses.  Nothing herein is intended to limit, expand or modify any provision contained in the Loan Documents relating to a Party's liability relating to fees and expenses (including without limitation Section 10.13 of the Loan Agreement) in connection with this Agreement or any negotiations contemplated hereby.

[signature page follows]

**IN WITNESS WHEREOF,** the Parties have executed this Agreement as of the date first above written.

**AGENT:**

**NEXBANK SSB, IN ITS CAPACITY AS SERVICER,**
a Texas Savings Bank

By: _____
Printed Name: _____
Title: _____


**LENDER:**

**HIGHLAND CAPITAL MANAGEMENT, L.P.,**
a Delaware limited partnership
on behalf of various investment vehicles sponsored
or controlled by Highland

By: _____
Printed Name: _____
Title: _____

6

**BORROWER:**

**J HOTELS FEE OWNER LLC,**
a Delaware limited liability company By *JT Management LLC*
*Its manager*
By: *J.C*
Printed Name: *SHAWN CARTER*
Title: *Manager*

**GUARANTORS:**

**SHAWN CARTER,**
an individual

*J.C*
*Shawn Carter*

**ABRAM SHNAY,**
an individual

By: _____

**CHARLES BLAICHMAN,**
an individual

By: _____

7

**BORROWER:**

**J HOTELS FEE OWNER LLC,**
a Delaware limited liability company

By:
Printed Name:
Title:

**GUARANTORS:**

**SHAWN CARTER,**
an individual

By:

**ABRAM SHNAY,**
an individual

By:

**CHARLES BLAICHMAN,**
an individual

By:

**BORROWER:**

**J HOTELS FEE OWNER LLC,**
a Delaware limited liability company

By: _____
Printed Name: _____
Title: _____

**GUARANTORS:**

**SHAWN CARTER,**
an individual

By: _____

**ABRAM SHNAY,**
an individual

By: _____

**CHARLES BLAICHMAN,**
an individual

By: _____

7

**IN WITNESS WHEREOF,** the Parties have executed this Agreement as of the date first above written.

AGENT:

**NEXBANK SSB, IN ITS CAPACITY AS SERVICER,**
a Texas Savings Bank

By: _____
Printed Name: _____
Title: _____

                                 **Jeff Scott**
                                 **Vice President**
                                 **NexBank, SSB**

LENDER:

**HIGHLAND CAPITAL MANAGEMENT, L.P.,**
a Delaware limited partnership
on behalf of various investment vehicles sponsored
or controlled by Highland

By: _____
Printed Name: _____
Title: _____

**IN WITNESS WHEREOF,** the Parties have executed this Agreement as of the date first above written.

AGENT:

**NEXBANK SSB, IN ITS CAPACITY AS SERVICER,**
a Texas Savings Bank

By: _____
Printed Name: _____
Title: _____


LENDER:

**HIGHLAND CAPITAL MANAGEMENT, L.P.,**
a Delaware limited partnership
on behalf of various investment vehicles sponsored
or controlled by Highland

By: Strand Advisors, Inc., its general partner

By: _____
Printed Name: _____ JASON POST
Title: _____ OPERATIONS DIRECTOR

**EXHIBIT C**

## Robert M. Kaplan

**From:** Kupinse, Andrew D. [akupinse@cl-law.com]
**Sent:** Monday, November 30, 2009 6:36 PM
**To:** Stuart I. Rich
**Cc:** Larry I. Drath; desiree@the4040club.com
**Subject:** RE: Highland Capital- J-Hotel:

Ok. I'll confirm. By the way, we of course reserve on the subject of who is responsible for any expenses. But I'll get back to you shortly with at least a narrative of whether anything has happened and then we can figure out what the environmental consultant needs if thery need something in writing. I am guessing nothing has changed that would need reporting.

Where you by any chance able to get the draft deed in lieu done today as you had indicated?

**From:** Stuart I. Rich [mailto:sir@msf-law.com]
**Sent:** Monday, November 30, 2009 5:17 PM
**To:** Kupinse, Andrew D.
**Cc:** Larry I. Drath; desiree@the4040club.com; Jeff Scott; Ted Dameris
**Subject:** RE: Highland Capital- J-Hotel:

What we need to know is what happened since June 2008 with respect to Time Warner's work and reporting and additionally where do things stand with NY DEP with regard to the No Further action letter? This information will make the process move more quickly and presumably less costly to the Borrower and guarantors.

**From:** Kupinse, Andrew D. [mailto:akupinse@cl-law.com]
**Sent:** Monday, November 30, 2009 4:53 PM
**To:** Stuart I. Rich
**Cc:** Larry I. Drath; desiree@the4040club.com
**Subject:** RE: Highland Capital- J-Hotel:

By the way, we should also give some thought as we work through this as to how our environmental insurance would dovetail with this no matter how things work out.

**From:** Kupinse, Andrew D.
**Sent:** Monday, November 30, 2009 4:51 PM
**To:** 'Stuart I. Rich'
**Subject:** RE: Highland Capital- J-Hotel:

Maybe you can have them call me and they can tell me directly what they want? Or I can simply type up a no knowledge of any environmental events since 2008 representation? Just let me know.

**From:** Stuart I. Rich [mailto:sir@msf-law.com]
**Sent:** Monday, November 30, 2009 4:45 PM
**To:** Kupinse, Andrew D.
**Subject:** RE: Highland Capital- J-Hotel:

Actually sorry for the cryptic comment. I think what they need is an update from the Borrower on anything that has happened since the June 2008 report.

**From:** Kupinse, Andrew D. [mailto:akupinse@cl-law.com]

**Sent:** Monday, November 30, 2009 4:43 PM
**To:** Stuart I. Rich
**Subject:** RE: Highland Capital- J-Hotel:

What do you mean by "approval updated information"? Is there a form? [Sorry I'll get my environmental law partner involved if need be, but hopefully you can tell me specifically what you need and I can get it for you]

Thanks,

**Andrew D. Kupinse**
Principal - Corporate Group

**Cummings & Lockwood LLC**
CELEBRATING A CENTURY OF SERVICE: 1909-2009
Six Landmark Square
Stamford, CT 06901
www.cl-law.com

203.351.4174 (Direct)
203.708.3897 (Private Fax)
email: akupinse@cl-law.com

**From:** Stuart I. Rich [mailto:sir@msf-law.com]
**Sent:** Monday, November 30, 2009 4:35 PM
**To:** Kupinse, Andrew D.
**Subject:** Highland Capital- J-Hotel:

Andrew:

Langan environmental did the most recent Environmental cost analysis in June 2008. We need the approval updated information from your client in order of them to properly update the information for accurate costs, otherwise we will need to obtain a review to assess the cost at a higher expense to your client.

Thanks.
Stuart I. Rich, Esq.
Partner
Meister, Seelig & Fein LLP
2 Grand Central Tower
140 East 45th Street, 19th Floor
New York, New York 10017
212-655-3590 (direct)
212-655-3500 (main)
646-539-3690 (fax)
sir@msf-law.com
www.meisterseelig.com

IMPORTANT NOTICE: NOTICE OF ATTORNEY'S CONFIDENTIALITY: The material submitted herewith contains and is intended to be a confidential transmission of information or documents from MEISTER SEELIG & FEIN LLP which is legally privileged. The materials or information enclosed are intended only for the use of the individual or entity named in this transmission. If you are not the intended recipient, any disclosure, copying, distribution or the taking of any action in reliance on the contents of this transmission is strictly prohibited. If you have received this telecopy transmission in error, please notify us by telephone immediately, so that we can arrange

for the return of the original documents to us at our cost.

**CIRCULAR 230 DISCLAIMER:** The IRS now requires written advice (including electronic communications) regarding one or more Federal (i.e., United States) tax issues to meet certain standards. Those standards involve a detailed and careful analysis of the facts and applicable law which we expect would be time consuming and costly. We have not made and have not been asked to make that type of analysis in connection with any advice given in this e-mail. As a result, we are required to advise you that any Federal tax advice rendered in this e-mail is not intended or written to be used and cannot be used for the purpose of avoiding penalties that may be imposed by the IRS.

In the event you would like us to perform the type of analysis that is necessary for us to provide an opinion that does not require the above disclaimer, as always, please feel free to contact us directly.

IRS CIRCULAR 230 DISCLOSURE: Although this written communication may address certain tax issues, it is not a reliance opinion as described in IRS Circular 230 and, therefore, it cannot be relied upon by itself to avoid any tax penalties.  If you would like a reliance opinion letter, please contact us and we will discuss our procedures for preparing one. Thank you.

CONFIDENTIALITY NOTICE: This email transmission (and/or the attachments accompanying it) may contain legally privileged and confidential information, and is intended only for the use of the individual or entity named above. If you are not the intended recipient, you are hereby notified that any dissemination, disclosure, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please promptly notify the sender by reply email and destroy the original message.

IRS CIRCULAR 230 DISCLOSURE: Although this written communication may address certain tax issues, it is not a reliance opinion as described in IRS Circular 230 and, therefore, it cannot be relied upon by itself to avoid any tax penalties.  If you would like a reliance opinion letter, please contact us and we will discuss our procedures for preparing one. Thank you.

CONFIDENTIALITY NOTICE: This email transmission (and/or the attachments accompanying it) may contain legally privileged and confidential information, and is intended only for the use of the individual or entity named above. If you are not the intended recipient, you are hereby notified that any dissemination, disclosure, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please promptly notify the sender by reply email and destroy the original message.

1/26/2010

**Robert M. Kaplan**

| | |
|---|---|
| **From:** | Kupinse, Andrew D. [akupinse@cl-law.com] |
| **Sent:** | Wednesday, December 02, 2009 3:41 PM |
| **To:** | Stuart I. Rich |
| **Cc:** | Larry I. Drath |

**Subject:** hotel

Stuart,

I have some more information regarding the environmental. I think nothing has changed from our perspective so we can give the environmental people a clean update to our knowledge. Larry Drath called the lawyer handling the environmental matters vis a vis TimeWarner. Apparently, TimeWarner is obligated for the little clean up there is, but only to the extent we get them access to the ground (I guess the only thing left is some soil removal). Apparently, the idea was to do this when the project was built, since trying to access the ground presently would be difficult. I have a call into that attorney as well just to confirm the relevant information. Let me know if there is anything I should ask from your perspective when I do, In any case, I am guessing from a property-status perspective this is all old news and was the case when the last environmental report was done. That said, of course I am just passing along information in reliance on others and the environmental people (but for whatever formal update representation we determine is appropriate) should confirm this.

Would you please advise of the status of the draft deed-in-lieu and settlement documents? I know at the meeting you noted we were to have them this past Monday. Can you provide a new ETA? Obviously December is traditionally a busy month for everyone and I am worried about losing any time at all. I really appreciate it.

Thanks,
Andrew


**Andrew D. Kupinse**
Principal - Corporate Group

**Cummings & Lockwood LLC**
CELEBRATING A CENTURY OF SERVICE: 1909-2009
Six Landmark Square
Stamford, CT  06901
www.cl-law.com

203.351.4174 (Direct)
203.708.3897 (Private Fax)
email: akupinse@cl-law.com

IRS CIRCULAR 230 DISCLOSURE: Although this written communication may address
certain tax issues, it is not a reliance opinion as described in IRS Circular 230
and, therefore, it cannot be relied upon by itself to avoid any tax penalties.  If
you would like a reliance opinion letter, please contact us and we will discuss
our procedures for preparing one. Thank you.

1/26/2010

CONFIDENTIALITY NOTICE: This email transmission (and/or the attachments accompanying it) may contain legally privileged and confidential information, and is intended only for the use of the individual or entity named above. If you are not the intended recipient, you are hereby notified that any dissemination, disclosure, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please promptly notify the sender by reply email and destroy the original message.

## Robert M. Kaplan

| | |
|---|---|
| **From:** | Kupinse, Andrew D. [akupinse@cl-law.com] |
| **Sent:** | Monday, December 07, 2009 7:14 PM |
| **To:** | Stuart I. Rich |
| **Cc:** | desiree@the4040club.com; Larry I. Drath |
| **Subject:** | hotel |

Stuart, Did you check with your client on sending the draft deed in lieu and related documents with rights reserved as we discussed on Friday?  It is the seventh today so we have 17 actual business days (and with Christmas, New Years, Hanukkah and end of the year schedules, far fewer than that).

Please let me know where you are on the environmental as well.

Thanks,
Andrew


**Andrew D. Kupinse**
Principal - Corporate Group

**Cummings & Lockwood LLC**
CELEBRATING A CENTURY OF SERVICE: 1909-2009
Six Landmark Square
Stamford, CT  06901
www.cl-law.com

203.351.4174 (Direct)
203.708.3897 (Private Fax)
email: akupinse@cl-law.com

1/26/2010

**Robert M. Kaplan**

| | |
|---|---|
| **From:** | Kupinse, Andrew D. [akupinse@cl-law.com] |
| **Sent:** | Tuesday, December 08, 2009 1:55 PM |
| **To:** | Stuart I. Rich |
| **Subject:** | RE: |

Might you call the environmental co and find out an ETA and give them a push?  Might you ask your client their ETA on when they will authorize us to work on this and share documents?  Would you please impress on them that we are trying to be cooperative and make this easy on everyone but we are running out of time?  Please, please try to move this for us.  We have already lost more than a week on a tight schedule.

**From:** Stuart I. Rich [mailto:sir@msf-law.com]
**Sent:** Tuesday, December 08, 2009 1:52 PM
**To:** Kupinse, Andrew D.
**Subject:** RE:

Client is waiting on the info from environmental but has not authorized me to release the document to you for your review yet.

**From:** Kupinse, Andrew D. [mailto:akupinse@cl-law.com]
**Sent:** Tuesday, December 08, 2009 1:51 PM
**To:** Stuart I. Rich
**Subject:**

Would you kindly get back to me on the requests of the past week?  I am not trying to be pushy but I am very concerned about the timing on finishing this up.  Please?

**Andrew D. Kupinse**
Principal - Corporate Group

**Cummings & Lockwood LLC**
CELEBRATING A CENTURY OF SERVICE: 1909-2009
Six Landmark Square
Stamford, CT  06901
www.cl-law.com

203.351.4174 (Direct)
203.708.3897 (Private Fax)
email: akupinse@cl-law.com

IRS CIRCULAR 230 DISCLOSURE: Although this written communication may address certain tax issues, it is not a reliance opinion as described in IRS Circular 230 and, therefore, it cannot be relied upon by itself to avoid any tax penalties.  If you would like a reliance opinion letter, please contact us and we will discuss our procedures for preparing one. Thank you.

CONFIDENTIALITY NOTICE: This email transmission (and/or the attachments accompanying it) may contain legally privileged and confidential information, and is intended only for the use of the individual or entity named above. If you are not the intended recipient, you are hereby notified that any dissemination, disclosure, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please promptly notify the sender by reply email and destroy the original message.

1/26/2010

**Robert M. Kaplan**

**From:** Kupinse, Andrew D. [akupinse@cl-law.com]
**Sent:** Thursday, December 10, 2009 3:03 PM
**To:** Stuart I. Rich

What is going on?  Can you please commit to have me something by tomorrow (that will be two weeks since our meeting)?  I really appreciate it.

## Robert M. Kaplan

**From:** Kupinse, Andrew D. [akupinse@cl-law.com]
**Sent:** Friday, December 11, 2009 3:04 PM
**To:** Stuart I. Rich
**Cc:** Larry I. Drath; desiree@the4040club.com
**Subject:** Highland

Stuart,

While I appreciate your indication that you are continuing to await a response from your client and that the delay is out of your hands, we had requested the deed information and environmental information relating to the tender date provision as far back as four (4) months ago (see my email of August 6, 2009, for example). And, at our last meeting, you advised with your client present that we could have drafts on Monday, Nov. 29th. I have asked for estimated timing on the environmental or the opportunity to speak with them, but have heard nothing. At some point, the delay and silence become untenable.

At this point, we must set a date to resolve this. Therefore, we are planning on being in a position to turn in the deed on Wednesday, December 16th. We believe there is no reason not to try to agree to all matters to convey the property to your client and put this behind everyone. As I have previously noted, we want nothing more than a cooperative process, regardless of how unfortunate the economic circumstances. But if we do not receive a draft of your proposed documents by Monday the 16th, we will prepare forms ourselves to have them ready for signature and submission for this revised target date. As for any matters that cannot be handled unilaterally, we would have to deal with those later. In terms of the grantee, unless I am instructed otherwise I would use the information on the mortgagee as listed on the land records and make delivery under the notice section of the mortgage of record.

I hope you understand that we simply cannot have this dragged out until the end of the month only to have a problem or a firedrill.

Again, if you could make us understand the reason for the delay, we are happy to listen. All I want is to make this process easy on everyone and not to run into the holidays and end of the year crunch. Please let me know right away if you have any thoughts.

Thanks,
Andrew

**Andrew D. Kupinse**
Principal - Corporate Group

**Cummings & Lockwood LLC**
CELEBRATING A CENTURY OF SERVICE: 1909-2009
Six Landmark Square
Stamford, CT 06901
www.cl-law.com

203.351.4174 (Direct)
203.708.3897 (Private Fax)
email: akupinse@cl-law.com

1/26/2010

Page 2 of 2

**Robert M. Kaplan**

**From:**    Stuart I. Rich [sir@msf-law.com]
**Sent:**    Monday, December 14, 2009 11:37 AM
**To:**      Kupinse, Andrew D.
**Subject:** RE: Highland

Andrew in conferred with my client and while we have done what we can to accommodate your client by meeting and otherwise engaging in discussions, my client is not in position to deliver any drafts of proposed deed in lieu conveyance documents at this time. Please note moreover, that my client is not under any obligation to do so and it is your client(s) that remain in continuing Default under the terms of the Loan documents. In addition, there still seems to be a disconnect as between your client(s) and Mr. Drath's as he has reached out to me with a verbal proposal on a restructure of the note. This is obviously sends conflicting messages to my client.

Please note that this communication is sent in accordance with the terms of the Pre-Negotiation Agreement currently in effect and all rights on behalf of my client remain expressly reserved and nothing herein shall be deemed a waiver of any defaults or other obligations of the Borrower and Guarantors.

Stuart I. Rich, Esq.
Partner
Meister, Seelig & Fein LLP
2 Grand Central Tower
140 East 45th Street, 19th Floor
New York, New York 10017
212-655-3590 (direct)
212-655-3500 (main)
646-539-3690 (fax)
sir@msf-law.com
www.meisterseelig.com

IMPORTANT NOTICE: NOTICE OF ATTORNEY'S CONFIDENTIALITY: The material submitted herewith contains and is intended to be a confidential transmission of information or documents from MEISTER SEELIG & FEIN LLP which is legally privileged. The materials or information enclosed are intended only for the use of the individual or entity named in this transmission. If you are not the intended recipient, any disclosure, copying, distribution or the taking of any action in reliance on the contents of this transmission is strictly prohibited. If you have received this telecopy transmission in error, please notify us by telephone immediately, so that we can arrange for the return of the original documents to us at our cost.
**CIRCULAR 230 DISCLAIMER:** The IRS now requires written advice (including electronic communications) regarding one or more Federal (i.e., United States) tax issues to meet certain standards. Those standards involve a detailed and careful analysis of the facts and applicable law which we expect would be time consuming and costly. We have not made and have not been asked to make that type of analysis in connection with any advice given in this e-mail. As a result, we are required to advise you that any Federal tax advice rendered in this e-mail is not intended or written to be used and cannot be used for the purpose of avoiding penalties that may be imposed by the IRS.

In the event you would like us to perform the type of analysis that is necessary for us to provide an opinion that does not require the above disclaimer, as always, please feel free to contact us directly.

**From:** Kupinse, Andrew D. [mailto:akupinse@cl-law.com]
**Sent:** Friday, December 11, 2009 3:07 PM
**To:** Stuart I. Rich
**Cc:** Larry I. Drath
**Subject:** RE: Highland

Apologies.  The date in the third line of the second paragraph should have read "Monday, the 13th."

**From:** Kupinse, Andrew D.
**Sent:** Friday, December 11, 2009 3:04 PM
**To:** 'Stuart I. Rich'
**Cc:** 'Larry I. Drath'; 'desiree@the4040club.com'
**Subject:** Highland

Stuart,

While I appreciate your indication that you are continuing to await a response from your client and that the delay is out of your hands, we had requested the deed information and environmental information relating to the tender date provision as far back as four (4) months ago (see my email of August 6, 2009, for example).  And, at our last meeting, you advised with your client present that we could have drafts on Monday, Nov. 29th.  I have asked for estimated timing on the environmental or the opportunity to speak with them, but have heard nothing.  At some point, the delay and silence become untenable.

At this point, we must set a date to resolve this.  Therefore, we are planning on being in a position to turn in the deed on Wednesday, December 16th.  We believe there is no reason not to try to agree to all matters to convey the property to your client and put this behind everyone.  As I have previously noted, we want nothing more than a cooperative process, regardless of how unfortunate the economic circumstances.  But if we do not receive a draft of your proposed documents by Monday the 16th, we will prepare forms ourselves to have them ready for signature and submission for this revised target date.  As for any matters that cannot be handled unilaterally, we would have to deal with those later.  In terms of the grantee, unless I am instructed otherwise I would use the information on the mortgagee as listed on the land records and make delivery under the notice section of the mortgage of record.

I hope you understand that we simply cannot have this dragged out until the end of the month only to have a problem or a firedrill.

Again, if you could make us understand the reason for the delay, we are happy to listen.  All I want is to make this process easy on everyone and not to run into the holidays and end of the year crunch.  Please let me know right away if you have any thoughts.

Thanks,
Andrew

**Andrew D. Kupinse**
Principal - Corporate Group

**Cummings & Lockwood LLC**
CELEBRATING A CENTURY OF SERVICE: 1909-2009
Six Landmark Square
Stamford, CT  06901
www.cl-law.com

203.351.4174 (Direct)
203.708.3897 (Private Fax)
email: akupinse@cl-law.com

IRS CIRCULAR 230 DISCLOSURE: Although this written communication may address certain tax issues, it is not a reliance opinion as described in IRS Circular 230 and, therefore, it cannot be relied upon by itself to avoid any tax penalties.  If you would like a reliance opinion letter, please contact us and we will discuss our procedures for preparing one. Thank you.

CONFIDENTIALITY NOTICE: This email transmission (and/or the attachments accompanying it) may contain legally privileged and confidential information, and is intended only for the use of the individual or entity named above. If you are not the intended recipient, you are hereby notified that any dissemination, disclosure, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please promptly notify the sender by reply email and destroy the original message.

1/26/2010